IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRYSTAL LOPEZ,<br><br>  Plaintiff,<br><br>  v.<br><br>ZARBEE'S, INC.,<br><br>  Defendant. | Case No. 22-cv-04465-CRB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |

Plaintiff Krystal Lopez brings this putative class action against Defendant Zarbee's, Inc. in connection with Zarbee's melatonin supplements.[1] Lopez alleges that Zarbee's products include significantly more melatonin than the label asserts, and therefore violate state consumer protection laws. Zarbee's moves to dismiss, arguing that all of the claims are completely preempted, and that Lopez lacks standing as to some claims. See MTD (dkt. 26). The Court found this matter suitable for resolution without oral argument, and therefore vacated the motion hearing. See Civil Local R. 7-1(b). Because Zarbee's arguments largely fail at this stage, the Court grants in part and denies in part the motion.

**I.   BACKGROUND[2]**

  **A.   The Parties**

Zarbee's, a Delaware corporation, sells melatonin supplements nationwide at retailers like Walmart and Target. FAC (dkt. 24) ¶¶ 3, 8. Lopez lives in California, and purchased a Zarbee's melatonin product in California. Id. ¶ 6.

---

[1] This is one of several melatonin suits brought by this law firm. Murphy v. Olly Public Benefit Corp., 22-cv-3760-CRB, is also before this Court.
[2] These background facts are drawn from the complaint and accepted as true for the purposes of this motion.

### B.   FDA Regulations for Dietary Supplements

Melatonin is a neurohormone that regulates sleep. Id. ¶ 1. Millions of consumers take over-the-counter melatonin supplements to help them sleep. Id. ¶ 14. Federal law imposes a comprehensive regulatory scheme for dietary supplements, including melatonin supplements. See generally FDCA, 21 U.S.C. § 301 et seq.; 21 C.F.R. Part 100 et seq. Under applicable FDA regulations, melatonin qualifies as an "other dietary ingredient," meaning that the quantity of melatonin in a supplement must be listed on the product label. 21 C.F.R. § 101.36(b)(3)(i). The declared quantity of melatonin must be established by a specific FDA-mandated test "consisting of 12 subsamples (consumer units), taken 1 from each of 12 different randomly chosen shipping cases, to be representative of a lot." See 21 C.F.R. § 101.9(g)(2); 21 C.F.R. § 101.36(f)(1) (applying this testing method to "other dietary ingredients").

The FDA forbids supplement labels that overstate quantities. FDA regulations require that the quantity of melatonin "be at least equal to the value . . . declared on the label" for the product's full shelf life. See 21 C.F.R. § 101.9(g)(4)(i). A product that has less melatonin than is listed on the label is "misbranded." See 62 Fed. Reg. 49826-01 at 49839 (Sept. 23, 1997).

The FDA treats supplement labels that understate quantities differently. The FDA recognizes that some supplements, like melatonin, degrade over time, "such that a product that contains a certain amount of a supplement when it gets put on the shelves might have less of that supplement at expiration." FAC ¶ 22. The FDA further recognizes that some manufacturers formulate their supplements with overages to ensure "that the finished product can meet the label declaration for that dietary ingredient throughout the product's shelf life." 68 Fed. Reg. 12158, 12203 (Mar. 13, 2003). Accordingly, there is a safe harbor: "[r]easonable excesses over labeled amounts are acceptable within current good manufacturing practice." 21 C.F.R. § 101.36(f)(1). Current good manufacturing practice requires manufacturers to keep track of "any intentional overage amount of a dietary

2

ingredient." 21 C.F.R. § 111.210(e).[3]

Although the FDA allows for overages, it does not intend "to allow a manufacturer to add excess dietary ingredients in unspecified amounts that would be in excess of the amount actually needed to meet the label declaration." 68 Fed. Reg. 12158, 12203; see also 72 Fed. Reg. at 34884 ("the amount of overage should be limited to the amount needed to meet the amounts listed in accordance with final § 111.210(d)."). The FDA has declined to adopt a specific cap on overages. See, e.g., 60 Fed. Reg. 67194-01 at 67207 (Dec. 28, 1995) (declining proposed 20% overage cap).

### C. This Litigation

In June of 2022, Lopez purchased a bottle of Zarbee's Children's Sleep with Melatonin Gummies from a Walmart store in Salinas, California. FAC ¶ 50. The gummies were for her 8-year-old child. Id. Lopez "relied on the fact that Zarbee's dosages were well-controlled" and "read and relied on the accuracy of the melatonin content on the label." Id. She chose the 1mg dose per gummy "because she did not want to give her child more melatonin, due to increased concerns about side effects and safety." Id. She gave him the gummies and noticed that they sometimes "would have a very strong tranquilizing effect that concerned her, and then the next day he would be unusually subdued." Id.

Lopez did a liquid chromatograph-mass spectrometry analysis on three gummies from each of two bottles of gummies, including the bottle she purchased. Id. ¶ 36. The gummy from Lopez's bottle had more than twice the amount of melatonin than what Zarbee's stated on the label (2.16mg instead of 1mg). Id. A gummy from a bottle that was one month away from expiring still had 222% of the claimed melatonin content (2.23mg instead of 1mg). Id.

Lopez initially brought suit in August of 2022, arguing that the product "was not accurately dosed or labeled." See Compl. (dkt. 1) ¶ 33. Zarbee's moved to dismiss the

---

[3] Manufacturers need not report those overages on their labels. 62 Fed. Reg. at 49831.

1   original complaint, arguing that the FDA allows for overages and that Lopez's testing
2   methodology was inadequate. See First MTD (dkt. 21) at 7–11. Lopez amended. FAC.
3   The FAC now alleges that "[b]ecause the excess is materially more than reasonably
4   necessary to ensure that the melatonin meets the amount specified on the product label
5   throughout the product's shelf life, Zarbee's Melatonin is unreasonably overdosed." Id. ¶
6   38. It includes claims for violation of: (1) California, Connecticut, Illinois, Maryland,
7   Missouri, and New York consumer protection acts; (2) California's Unfair Competition
8   Law (UCL); (3) California's False Advertising Law (FAL); (4) California's Consumers
9   Legal Remedies Act (CLRA); as well as: (5) breach of express warranty; and (6) unjust
10  enrichment/quasi-contract. Id. ¶¶ 67–110. Zarbee's again moves to dismiss. See MTD.

## II.   LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court may dismiss a complaint for failure to state a claim upon which relief may be granted. The Court may base dismissal on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019) (cleaned up).

A complaint must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (cleaned up). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a 12(b)(6) motion. Id. (citing Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007)). When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a

4

court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). A court may deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008).

### III. DISCUSSION

Zarbee's argues that the FAC should be dismissed with prejudice because (A) all of the claims are completely preempted by the FDA, and (B) Lopez lacks standing.

#### A. Express Preemption

The FDA expressly preempts state law claims that seek to impose manufacturing and labeling requirements for dietary supplements that are "not identical to" federal requirements of the same type. 21 U.S.C. § 343-1(a)(1); see also 21 C.F.R. § 100.1(c)(4) ("not identical to" means "that the State requirement directly or indirectly imposes obligations . . . concerning the composition or labeling of food" that are "not imposed by or contained in the applicable [federal statute or regulation]" or "[d]iffer from those specifically imposed by or contained in the applicable [federal statute or regulation]"); 21 U.S.C. § 321(ff) (dietary supplements are "a food" within the meaning of the FDCA). Zarbee's argues that the FDA expressly preempts Lopez's claims because (1) she is complaining about FDA-permitted overages; and (2) the testing method Lopez uses to support her claims deviates from the FDA-mandated testing method. MTD at 8–14. "Preemption is an affirmative defense," so the burden is on Zarbee's to prove it. See Cohen v. ConAgra Brands, Inc., 16 F.4th 1283, 1289 (9th Cir. 2021).

##### 1. Overages

Stressing that the FDA allows manufacturers to include overages in nutritional supplements, Zarbee's contends that Lopez's claims, all based on overages in Zarbee's

5

melatonin products, are preempted. MTD at 9–12. Zarbee's cites to Ochoa v Church & Dwight Co., Inc., No. 5:17-cv-2019-ODW (SP), 2018 WL 4998293 (C.D. Cal. Jan. 30, 2018), as an example of courts "dismiss[ing] as preempted state-law claims that a supplement is mislabled because it includes more than the declared amount of a dietary ingredient." Id. at 10. But Ochoa does not help Zarbee's.

In Ochoa, the plaintiff alleged based on independent laboratory testing that the defendant understated the amount of folic acid in its prenatal gummies. 2018 WL 4998293, at *1. She alleged that the label on defendant's gummies denotes 800 mcg of folic acid per serving, but that the lab found amounts of 1,100 mcg and 2,047 mcg in the tested gummies, and that the upper tolerable intake limit for folic acid is 1,000 mcg. Id. The court discussed the same authority cited herein about overages, and then turned to the defendant's argument that the plaintiff "seeks to impose a labeling requirement that is not 'identical' to the FDA supplement label regulations.'" Id. at *4. The court concluded that the plaintiff's claims were preempted because "she has not pled that the excess (or overage) is unreasonable and not consistent with good manufacturing practices for insuring that the folate level does not fall below the label amount during the product's shelf life." Id. at *5 (emphasis added). Instead, she had alleged that the gummies had "'a materially significant amount in excess' that 'significantly exceeds the tolerable upper limit for folic acid.'" Id. Because the regulations did not include those standards, the plaintiff was "seek[ing] to impose requirements that plainly are not in the regulations." Id.[4] However, the court concluded that the plaintiff could amend her complaint to correct this deficiency, and granted her leave to amend. Id.

Zarbee's argues that "likewise, Plaintiff fails to plausibly allege that the amount of excess melatonin present in her Gummies was unreasonable and inconsistent with good manufacturing practices." MTD at 10. That may have been the problem with the original

---

[4] The court also held that the plaintiff failed to allege that she had used the FDA's testing methods. Id. The Court addresses that issue next but notes that Ochoa (filed 1/30/18) pre-dates Durnford v. MusclePharm Corp., 907 F.3d 595 (9th Cir. 2018) (filed 10/12/18).

6

complaint. But in the FAC, Lopez's allegation is precisely what was missing in Ochoa. See FAC ¶ 38 (Zarbee's dosage is "materially more than reasonably necessary to ensure that the melatonin meets the amount specified on the product label throughout the product's shelf life").

Zarbee's focuses on the FAC's reference to a 10–15% overage as reasonable, arguing that Lopez has "invent[ed] an overage threshold from thin air that she unilaterally deems 'reasonable.'" MTD at 10. But Lopez's point about the 10–15% overage is that "other U.S. manufacturers" who sell melatonin supplements put their products on the shelf with a 10–15% overage, which is "reasonable because, by the time the shelf life ends, the product has approximately the amount of melatonin that is declared on the label." FAC ¶ 25. Lopez does not argue that only a 10–15% overage would be reasonable, but that Zarbee's overages are so excessive by comparison that they could not possibly be necessary to ensure "that the [melatonin] level does not fall below the label amount during the product's shelf life." See Ochoa, 2018 WL 4998293, at *5. This might or might not be true: discovery can show how long it takes melatonin to degrade during a given product's shelf life. In the meantime, Lopez has pointed to the correct standard. She has not alleged that Zarbee's did something wrong by doing something "specifically approved by the FDA." See Carter v. Novartis Consumer Health, Inc., 582 F. Supp. 2d 1271, 1285 (C.D. Cal. 2008). She has not alleged that there is too much of something based on the "upper tolerable intake limit" or some other metric. Instead, she alleges that there is more than what is required to "meet the label declaration for that dietary ingredient throughout the product's shelf life." See 68 Fed. Reg. 12158, 12203; see also 68 Fed. Reg. 12158, 12203 (not intended to allow "excess dietary ingredients in unspecified amounts that would be in excess of the amount actually needed to meet the label declaration.").[5]

---

[5] Zarbee's also argues that Lopez's arguments in support of this standard are "speculative and conclusory"—that based on her inadequate testing methods, she suspects that the gummies would have an unreasonable amount of melatonin in them after they expire. See MTD at 10–11. This argument, which overlaps somewhat with the next section, is not persuasive. The FAC describes laboratory testing that supports its claim of an unreasonable overage. See FAC ¶¶ 34–39.

7

Because Lopez's claims would not impose requirements on manufacturers that are different from what the FDA requires, they are not preempted. See Chavez v. Church & Dwight Co., Inc., No. 17 C 1948, 2018 WL 2238191, at *5, 6 (N.D. Ill. May 16, 2018) (no preemption where plaintiff alleged that "Church added more folic acid to Vitafusion than was necessary to ensure that the level of folic acid meets the labeled amount over the course of the supplement's shelf life" because that "plausibly alleges that Vitafusion is misbranded within the confines of the FDCA").

### 2. Testing Method

Zarbee's next argues that Lopez's claims are preempted because the FDA requires a specific testing method, and the FAC admits that Lopez did not follow it. See MTD at 12–14; see also FAC ¶¶ 34–38 (describing a testing method that is indisputably not the FDA method). Zarbee's continues: "[f]orcing manufacturers to ensure that they meet not only FDA's rigorous testing requirements, but also Plaintiff's bespoke approach, would impose obligations on manufacturers that differ from those imposed by federal law." Id. at 12. Zarbee's position—that a complaint must allege compliance with the FDA testing method—was the law at one point. See, e.g., Mee v. I A Nutrition, Inc., No. C-14-5006 MMC, 2015 WL 2251303, at *4 (N.D. Cal. May 13, 2015) ("As each district court to have considered the matter has found, where, as here, an FDA regulation provides that the question of compliance must be determined using the method specified therein, a state law claim that seeks to establish a violation of such regulation by a different methodology is preempted.").

But Durnford v. MusclePharm Corp., 907 F.3d 595 (2018), might represent a change in the law. In Durnford, the plaintiff brought a misbranding claim about the composition of protein in a particular supplement. 907 F.3d at 603. Although the issue of "whether or not there was compliance with the FDA's 12-sample testing protocol [did] not matter" in that case, the court took the opportunity to comment:

> We need not address whether plaintiffs are ever required to allege, at the pleading stage, that there are tests contradicting the nutrition panel that comply with the FDA's testing

8

>     protocols. We note, however, that plaintiffs are generally not expected to provide evidence in support of their claims at the pleading stage . . . nor are they required to plead the 'probability' of their entitlement to relief[.] In addition, FDCA preemption, like all federal preemption, is an affirmative defense. . . . 'Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6).'

Id. at 603 n.8.

Some district court cases have taken note of this dicta from Durnford and departed from the long-held practice noted in Mee. Thus, in Amavizca v. Nutra Manufacturing, LLC, No. 08-cv-1324-RGK-MAA, 2020 WL 8837145, at *5 (C.D. Cal. Oct. 20, 2020), the court held that, where the plaintiff had not alleged that he followed the FDA 12-sample testing method but instead tested three bottles, none of which contained glucosamine sulfate, such allegations were "sufficient to survive Defendants' assertion of federal preemption." The court noted that to require the plaintiff "to specifically allege testing in conformance with [the FDA method] would be tantamount to requiring [p]laintiff 'to provide evidence in support of [his] claims at the pleading stage.'" Id. (citing Durnford, 907 F.3d at 603 n.8 and Diamos v. Walmart Inc., No. 2:19-cv-5526-SVW (GJS), 2020 WL 1942322, at *3 (C.D. Cal. Jan. 9, 2020) (holding, where plaintiff alleged a complete absence of an advertised supplement, supported by allegations of independent testing, that plaintiff stated a claim for relief that was not preempted)); see also Carrol v. S.C. Johnsons & Son, Inc., No. 17-cv-5828, 2018 WL 1695421, at *3 (N.D. Ill. March 29, 2018) ("Courts in this district have held that plaintiffs can sufficiently allege mislabeling claims based on preliminary testing that was not completed in compliance with FDA standards.").

Lozano v. Bowmar Nutrition LLC, No. 2:21-cv-4296-MCS-KS, 2021 WL 4459660 (C.D. Cal. Aug. 19, 2021) is somewhat different and represents a line of cases the Court must acknowledge. In Lozano, the court cited Durnford in holding that "[f]ederal pleading standards do not require Plaintiff to affirmatively allege that her laboratory testing comports with the FDA sampling regulation." 2021 WL 4459660, at *6 (citing Durnford, 907 F.3d at 603 n.8). The court noted that preemption would not be an issue if the plaintiff

9

had "stood solely on allegations that the products contain less protein than Defendant represented." Id. However, Lozano also stated that "the reports [that the plaintiff relied upon] do not admit noncompliance with FDA sampling methodology" and so it was not as if the plaintiff had pleaded itself out of court. Id.; see also Rubio v. Orgain, Inc., No. EDCV 18-2237-MWF (SHKx), 2019 WL 1578379, at *3–4 (C.D. Cal. March 5, 2019) (finding claim preempted where plaintiff attached testing that was not FDA-compliant); Forouzesh v. CVS Pharmacy, Inc., No. 2:18-cv-4090-ODW (AFMx), 2019 WL 652887, at *5 (C.D. Cal. Feb. 15, 2019) (holding that "requiring at least some facts to support a plausible inference of FDA-compliant testing is proper" and stating that "[e]ven courts that do not require factual support for FDA-compliant testing agree that a claim seeking to use a methodology other than that required by the FDA would be preempted.").

Here, unlike in Lozano, the FAC does make clear that Lopez did not test 12 samples according to the FDA's method. See FAC ¶¶ 34–48 (Lopez tested three samples, and three gummies from each sample). However, this Court does not agree with the authority that would therefore conclude that Lopez had pleaded herself out of court. Pleading that one has conducted independent, non-FDA compliant testing that suggests an unreasonable overage does not suggest that one could not support allegations of unreasonable overage with FDA-compliant testing. It is a reasonable inference at this stage that "[i]f less-exhaustive test results indicate that a supplement is overdosed, it is plausible . . . that the supplement is in fact overdosed." Opp'n (dkt. 31) at 8; see also Warren v. Whole Foods Market California, Inc., No. 21-cv-4577-EMC, 2022 WL 2644103, at *6 (N.D. Cal. July 8, 2022) ("The alleged inadequacies in methodology or interpretation of scientific testing do not warrant dismissal under Rule 12(b)(6) so long as the court can still reasonably infer from the testing result and other alleged facts, taken as true, that the defendant is liable for the misconduct alleged."). Requiring plaintiffs to allege that they complied with the FDA testing method would be requiring them to "provide evidence in support of [their] claims at the pleading stage.'" See Durnford, 907 F.3d at 603 n.8. That is not required in notice pleading, see Iqbal, 556 U.S. at 678 (requiring sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face,'"), and might be difficult to do, see Muir v. NBTY, Inc., No. 15 C 9835, 2016 WL 5234596, at *5 (N.D. Ill. Sept. 22, 2016) ("the court is uncertain how a plaintiff, prior to discovery, would have access to 'randomly chosen shipping cases' from which he could have selected 12 consumer samples that he could be sure had come 'from a single lot.'"); see also Opp'n at 9–10 (arguing that facts about overages are peculiarly within Zarbee's knowledge); FAC ¶ 39 (FDA requires Zarbee's to retain internal testing re overages so "it is reasonable to infer that Zarbee's own testing (using FDA protocols) will confirm that the products are substantially (and unreasonably) overdosed.").

Like the plaintiff in Amavizca who tested just three samples, 2020 WL 8837145, at *5, Lopez has alleged enough to plausibly claim that Zarbee's violates the FDA standard for overages. Put another way, Zarbee's has not met its burden to establish that Lopez pleaded herself out of court by pleading facts that establish Zarbee's compliance with FDA regulations.

Lopez will eventually have to prove that Zarbee's failed to comply with the FDA overage regulations. See Chavez, 2018 WL 2238191, at *5 ("To be sure, it remains to be seen whether the predicate for Chavez's argument bears up under scrutiny. But his claim that including harmful levels of folic acid falls outside the bounds of reasonableness . . . is by no means implausible."); Clay v. Cytosport, Inc., No. 15-cv-165 L(DHB), 2015 WL 5007884, at *4 (S.D. Cal. Aug. 19, 2015) ("Of course, in order to ultimately prevail on these claims, Plaintiffs will have to prove that Defendant did not comply with the FDCA provisions listed above. However, to state a claim, Plaintiffs only need to allege a plausible violation of the FDCA."). In addition, Zarbee's may re-raise the issue of preemption at a later point if appropriate. See Lozano, 2021 WL 4459660, at *7 ("the Court declines to dismiss the claims on this motion because the SAC does not squarely present a preemption problem, but Defendant may renew its preemption challenge if Plaintiff's claims prove inconsistent with the FDCA.").

The Court does not dismiss the FAC based on express preemption.

### B. Standing

Zarbee's argues that Lopez lacks standing to bring claims based on (1) products she did not purchase, (2) the Zarbee's website, which she did not visit, and (3) other states' laws. MTD at 14–17.

#### 1. Unpurchased Products

A plaintiff may bring claims for products she did not purchase, so long as her injury from a product is "'substantially similar' to the injuries suffered by [the other] class members." McKinney v. Corsair Gaming, Inc., No. 22-CV-00312-CRB, 2022 WL 2820097, at *13 (N.D. Cal. July 19, 2022) (quoting Garnica v. HomeTeam Pest Def., Inc., 14-cv-5243, 2015 WL 13066140, at *1–2 (N.D. Cal. Dec. 21, 2015)). Products are "substantially similar" if "the resolution of the asserted claims will be identical between the purchased and unpurchased products." Ang v. Bimbo Bakeries USA, Inc., No. 13-cv-01196-WHO, 2014 WL 1024182, at *8 (N.D. Cal. Mar. 13, 2014). Thus, in the labelling context, if each label is "false in the same way," then the "unpurchased products . . . do 'not implicate a significantly different set of concerns than' those purchased by the named plaintiffs" and thus, "[b]y establishing that any of the labels were misleading, the [p]laintiffs would necessarily establish that they all were." McKinney, 2022 WL 2820097, at *13 (quoting Garrison v. Whole Foods Market Group, Inc., No. 13-cv-5222-VC, 2014 WL 2451290, at *4 (N.D. Cal. June 2, 2014)).

Lopez alleges that she bought and tested only one Zarbee's product—the children's gummies—but she brings claims concerning other Zarbee's melatonin products that she neither bought nor tested, including an oral suspension and tablets. See FAC ¶ 29 & Ex. 1. Lopez alleges that Zarbee's dosing claims "are substantially similar for all accused Zarbee's Melatonin products." Id. ¶ 31. She alleges that the samples of the Zarbee's children's gummies that she tested were overdosed, and so "it is reasonable to infer that Zarbee's own testing (using FDA protocols) will confirm that [all] the products are substantially (and unreasonably) overdosed." Id. ¶ 39; see also id. ¶ 40 ("the dosing is unreasonably excessive. . . . For all accused Zarbee's Melatonin, the label is false in the

12

same way.").

Lopez has not plausibly alleged that the non-purchased, non-tested Zarbee's melatonin products are overdosed. Her allegations on that point are speculative and conclusory. See Iqbal, 556 U.S. at 678 (conclusory statements insufficient); see also Forouzesh, 2019 WL 652887, at *5 (dismissing complaint where plaintiff's "vague allegations broadly encompass the entire CVS Sport 100+ product line without identifying any factual similarities across those products beyond the SPF value."); Opp'n at 11 ("To be sure, there are differences among the products"). It is not a reasonable inference that the gummies, tablets, and liquid products at issue all "come from the same, systematic manufacturing practice, with similar overages." See id. at 12.

That products all contain the same key ingredient can sometimes satisfy the pleading standard. See, e.g., Lanovaz v. Twinings N. Am., Inc., No. C-12-2646-RMW, 2013 WL 2285221, at *3 (N.D. Cal. May 23, 2013) (where plaintiff claimed that plant ingredient was not a "natural source of antioxidants" and 51 products were made from that same plant ingredient, there was a substantial similarity between the products). But here, the issue is not the presence of a particular ingredient, it is the quantity of that ingredient. See Ang, 2014 WL 1024182, at *8 ("where the actual composition or appearance of the product is legally significant to the claim at issue, the consumer may only be allowed to pursue claims for products with identical product composition and/or appearance."). Showing that melatonin was overdosed in the children's gummies does not "necessarily establish" that it was overdosed in the other challenged products. See McKinney, 2022 WL 2820097, at *13 (quoting Garrison, 2014 WL 2451290, at *4).

Accordingly, Lopez has not adequately alleged that melatonin products are "substantially similar" such that "the resolution of the asserted claims will be identical between the purchased and unpurchased products." See Ang, 2014 WL 1024182, at *8. Her claims based on unpurchased products are dismissed, with leave to amend.

### 2.    Website

Claims based on websites that plaintiffs fail to allege having actually "viewed and

relied on" are subject to dismissal.  See Rugg v. Johnson & Johnson, No. 17-cv-5010-BLF, 2018 WL 3023493, at *7 (N.D. Cal. June 18, 2018).  According to the FAC, the Zarbee's website claims that "Each gummy contains 1 mg melatonin, which is safe" and can "help your little one."  FAC ¶ 42.  The FAC argues that this representation demonstrates that Zarbee's "admits that accurate dosing and labelling is material to reasonable consumers."  Id.  The FAC specifically explains: "The point is not that all [consumers] read the website—the point is that Zarbee's itself admits that accurate dosing and labelling is material to reasonable consumers."  Id.

  Zarbee's nonetheless moves to dismiss any claims based on its website, as Lopez "does not allege that she read, let alone relied on, any of these website statements when deciding to purchase her Gummies."  MTD at 16.  Lopez responds that she is not claiming to have relied on any website statements, and cites the website only as proof "that accurate dosing and labelling matters to consumers."  Opp'n at 12.  Zarbee's insists that "the allegations in her pleading concerning Zarbee's website should be disregarded, and Plaintiff should be prohibited from seeking discovery or basing any claim or argument on any website content."  Reply (dkt. 32) at 11.

  No misrepresentations on Zarbee's website form the basis for any of Lopez's claims, and so there is nothing for the Court to dismiss.

### 3. Other States' Laws

  Finally, there is the question of whether Lopez can bring claims under other states' laws.  In Count 1, she "brings individual and subclass claims based on California law," and "[f]or the Multi-State Consumer Protection Subclass,[6]" she brings claims for violations of "state consumer protection laws that are materially-similar to the laws of California," including California, Connecticut, Illinois, Maryland, Missouri, and New York.  FAC ¶ 68.  Zarbee's moves to dismiss the other-state part of Count 1, arguing that Lopez resides in California and purchased the gummies in California, and therefore lacks standing to assert

---

[6] Lopez defines this as "All persons who purchased Zarbee's Melatonin in the identified states (see Count 1) during the applicable statute of limitations."  FAC ¶ 58.

claims under any state but California. MTD at 16. Zarbee's quotes Jones v. Micron Technology, Inc., 400 F. Supp. 3d 897, 908 (N.D. Cal. 2019), for the proposition that "[c]ourts in the Ninth Circuit have consistently held that a plaintiff in a putative class action lacks standing to assert claims under the laws of states other than those where the plaintiff resides or was injured." MTD at 16. Lopez responds that Zarbee's has failed to show that the California law is materially different from other states' laws on the facts of the case, and that this Court should defer the issue until class certification. See Opp'n at 13 (citing McKinney, 2022 WL 2820097).

There have been a flurry of recent cases on this issue, generally either concluding that this is a standing issue or that it is a Rule 23 issue. Judge Chen summarized some of the recent history in Sultanis v. Champion Petfoods USA Inc., No. 21-cv-162-EMC, 2021 WL 3373934, at *5 (N.D. Cal. Aug. 3, 2021), noting that "[c]ourts in the Ninth Circuit have been split on whether a named plaintiff in a putative class action has standing to assert claims under the laws of states where the named plaintiff does not reside or was injured." He cited Jones as representing what "most courts have held," then discussed approvingly Judge Chhabria's holding in Patterson v. RW Direct, Inc., No. 18-cv-55-VC, 2018 WL 6106379, at *1 (N.D. Cal. Nov. 21, 2018), that "whether a named plaintiff can represent class members whose claims arise under the laws of different states does not appear to be a question of standing [because] Patterson does not himself seek to raise a claim under the laws of a different state; rather, he seeks to represent a class member who can raise such a claim." Sultanis, 2021 WL 3373934, at *5. Judge Chen concluded "in line with Judge[] Chhabria . . . that whether a plaintiff can bring claims on behalf of unnamed plaintiffs under the laws of states in which the named plaintiff does not reside or was injured is a matter of typicality, adequacy, and predominance under Rule 23, not Article III standing." Id. at *6. Judge Chen nevertheless concluded that he had the discretion to decide at the pleadings stage that the plaintiff did not satisfy Rule 23, and did so in that case largely as a matter of case management because there were so many out-of-state putative class members. Id. at *7. Judge Chen's reasoning is persuasive.

15

In McKinney, the plaintiff had alleged that the defendant's packaging and advertisements contained deceptive and misleading statements in violation of the common law and consumer protection laws of California and 43 other states. 2022 WL 2820097, at *1. This Court agreed that district courts have discretion to address this issue in either a motion to dismiss or a motion for class certification. Id. at *11–12.[7] And this Court concluded that the defendant had not "provided a sufficient description of other state laws to meet its burden of showing that Plaintiffs lack standing to bring claims under those other states' laws," noting that defendants "presented essentially one page of argument in its motion" with no detail. Id. at *13. More recently in McKinney, see Order on MTD (dkt. 53) in Case No. 3:22-cv-312-CRB at 12, the Court concluded that the defendant, having made a new showing, had "met its burden to show that the states' consumer protection regimes are different."

Here, Zarbee's has not even tried to make a showing about other states' laws. And because the FAC only asserts state claims for five additional states (none as populous as California), there is not the same case management concern Judge Chen encountered in Sultanis. The Court therefore denies Zarbee's motion to dismiss on this basis, but will allow Zarbee's to re-raise this issue at a later date, likely framed as whether, per Rule 23, Lopez can represent class members with claims based on other states' laws.

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the motion to dismiss only as to the unpurchased products, and DENIES it in all other respects. Lopez may amend her complaint as to the unpurchased products, if she wishes to do so, within thirty days of this

//

//

---

[7] Zarbee's tries to distinguish McKinney, saying that "McKinney addressed whether a nationwide class could be maintained under California's consumer protection laws." Reply at 10. But McKinney addressed other states' laws in the context of the defendant's argument that "Plaintiffs cannot represent a class of out-of-state consumers bringing claims under other states' laws because those other laws do not apply to Plaintiffs." 2022 WL 2820097, at *11.

order.

**IT IS SO ORDERED.**

Dated: January 17, 2023

CHARLES R. BREYER
United States District Judge